# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ROBERT MADDEN,**

        Plaintiff,

    –vs–                     **Case No. 13-C-549**

**DR. ENRIQUE LUY and
DR. DAVID FOLEY,**

        Defendants.

---

## DECISION AND ORDER

---

The *pro se* plaintiff, Robert Madden, alleges that the defendants, Drs. Enrique Luy and David Foley, were deliberately indifferent to his medical condition in violation of the Eighth Amendment. The defendants move for summary judgment. For the reasons that follow, the motion is granted.

## FACTS[1]

At all relevant times, the plaintiff, Robert Madden (Mr. Madden), was a Wisconsin state prisoner. Defendant Enrique Luy, M.D. (Dr. Luy), who has been licensed to practice medicine in Wisconsin since 1972, is employed by the Wisconsin Department of Corrections (DOC) as a physician at the Racine Correctional Institution (RCI). Defendant David Foley, M.D., (Dr. Foley), who has been licensed to practice medicine in the State of Wisconsin since July 1,

---

[1] These facts are taken from the Defendants' Proposed Findings of Fact.

2007, specializes in liver and kidney transplantation, performs general surgery procedures on transplant patients, and serves in the abdominal organ transplant program of the University of Wisconsin (UW) Hospitals and Clinics.

## Accessing Off-site Medical Treatment

DOC policy governs how practitioners obtain approval to refer inmates offsite for non-emergent care. If the physician determines that an inmate has a medical issue that would require him to go off-site to see a specialist or to receive a procedure that cannot be performed at the institution, the physician will submit a Class III request to the Bureau of Health Services.

Class III requests are reviewed in two ways. First, practitioners may use an electronic database and submit it to BHS staff to review the Class III request and make a determination (approval/denial) on the request. Staff may submit the request for review and determination if the request does not meet all the criteria for approval or there is some question about the request. The second way to review a Class III is for the submitting physician to take the request to a committee of doctors for review. The committee meets approximately once a week. The objective of the committee's review is to determine whether the Class III request is the proper treatment needed or if an alternative treatment would be better and whether the request is medically necessary.

If the Class III request is approved, the submitting physician is notified. The institution Health Services Unit staff then make an appointment for the inmate to be seen off-site by a consulting physician. A consulting physician may make recommendations concerning a course of treatment for an inmate. Such recommendations are made to the institution's treating physician. The treating physician is not bound by the recommendations of the consulting physician or therapist and may adopt or reject any or all of the recommendations in light of the treating physician's own medical judgment and in light of security and other institutional concerns.

### Dr. Foley's Medical Care of Mr. Madden

On April 16, 2008, Nurse Practitioner G. Patrice Kennedy, from the UW Gastroenterology and Hepatology Department, referred Mr. Madden to the UW Primary Liver Tumor Clinic after a finding of small hepatocellular carcinoma (tumor). Based on Nurse Kennedy's referral, Dr. Foley saw Mr. Madden on May 2, 2008 in the Primary Liver Tumor Clinic for consultation for possible surgical resection. Based on Dr. Foley's exam of Mr. Madden and review of the records, he found that Mr. Madden had a history of hepatitis C, and recently had been diagnosed with a 1.4-cm focus of hepatocellular carcinoma in segment 6 of his liver.

Although Mr. Madden was a suitable candidate for resection, it was felt that percutaneous ablation of the carcinoma with either radiofrequency or

microwave would be his best option. Microwave ablation is a technique that involves destroying the liver tumor with the application of a probe directly into the tumor utilizing microwave energy to destroy the tumor. Dr. Foley formulated a treatment plan for Mr. Madden that included an ultrasound-guided percutaneous radiofrequency ablation that week. Dr. Foley stated that a follow-up CT scan or MRI would be performed within one month after treatment of his tumor.

Two radiologists – Dr. Durick and Dr. Lee – performed a microwave ablation of the hepatic mass on May 8, 2008. The ablation zone did extend to involve the diaphragmatic surface and a small portion of the intercostal musculature as it was noted in the records that there was a complication of a small area of diaphragmatic burn and intercostal musculature burn. Dr. Foley did not perform the ablation that caused Madden's diaphragmatic burn and intercostal musculature burn. Although Mr. Madden's tumor was ablated by Dr. Lee and Durick in radiology, he was admitted to Dr. Foley's service for inpatient management and care after the procedure because the radiologist did not have admitting privileges.

Mr. Madden was discharged on May 13, 2008, with a diagnosis of hepatocellular carcinoma lesion; fevers secondary to necrotic liver tissue, resolved; abnormal lung lesion, evaluated; and status post microwave ablation of hepatic mass. Dr. Foley performed a discharge review and assessment of

Mr. Madden and again noted that the ablation slightly involved the diaphragmatic surface as well as intercostal musculature. Dr. Foley further noted that Mr. Madden developed fevers as high as 102. This was followed sequentially and treated with Tylenol and ibuprofen and felt to be related to the necrotic liver portion post the ablation. However, his fevers eventually defervesced and his pain was controlled with oral pain medication. Dr. Foley discharged Mr. Madden with the instructions to follow up in one month with a repeat MRI to follow up his lesion of the abdomen. Dr. Foley noted that Mr. Madden would be seen by Dr. Musat in the Liver Clinic on that same day.

Based on Dr. Foley's review of the record, the recommended one month follow-up was not scheduled. In this situation the follow- up appointment is usually made through the outpatient clinic with the primary MD, not the consulting surgeon who managed the patient during the in-hospital course after microwave ablation. Dr. Foley has no involvement in scheduling follow-up appointments for DOC inmates. The institution HSU staff schedule and arrange appointments for an inmate to be seen off-site by a consulting physician.

On January 14, 2009, Mr. Madden was seen by Nurse Kennedy for a telemedicine visit for his history of chronic hepatitis C complicated by hepatocellular carcinoma. Nurse Kennedy noted that this was treated with ablation on May 8, 2008, a post MRI scan initially showed no evidence of

recurrence, and a follow-up scan was recommended for mid- to late-September by Dr. Musat. The follow-up scan was performed October 17, 2008, at UW, and it was noted that there was a 5-mm development of a new hyperenhancement in the medial segment of the left hepatic lobe. This was thought to represent a perfusion abnormality versus a hepatoma. Attention was recommended on future radiologic exams. Nurse Kennedy further noted that the site of the radio frequency ablation appeared stable and did not demonstrate any abnormal enhancement. Nurse Kennedy stated that neither she nor Dr. Musat nor Mr. Madden was notified of these findings. It is Dr. Foley's understanding that Nurse Kennedy is referencing the noted "new hyperenhancement in the medial segment of the left hepatic lobe" noted in the October 17, 2008 scan.

Dr. Foley did not order and had no involvement in the October 17, 2008 scan.

**Dr. Luy's Medical Care of Madden**

Mr. Madden was seen by Dr. Alexandru Musat in the UW Liver Transplant Clinic on December 8, 2010, for his complaints of pain at the site of a previous microwave ablation and for follow up of a small lesion suggestive of hepatocellular carcinoma developing in the left lobe of the liver. Dr. Musat noted that he was concerned that Mr. Madden was slowly developing a second heptocellular carcinoma in the left lobe of the liver.  Id.  Hepatocellular

- 6 -

carcinoma is the most common type of liver cancer. Most cases of HCC are secondary to either a viral hepatitis infection (hepatitis B or C) or cirrhosis (alcoholism being the most common cause of hepatic cirrhosis).

Dr. Musat made a plan to review the imaging studies with other physicians on the Multidisciplinary Liver Tumor Board and determine further management, such as the possibility of repeat ablation and consideration for a liver biopsy. Musat further planned to schedule Mr. Madden for a repeat CT scan of the chest, abdomen, and pelvis to be performed in the biphasic manner in three months, noting that the plan would be altered depending on the recommendations in the Multidisciplinary Tumor Board and that he should also get a preliminary appointment in three months. Dr. Musat also recommended that Mr. Madden be sent to the UW Pain Clinic if a repeat ablation was not going to be performed. Dr. Musat wanted the Pain Clinic to consider a nerve block to manage pain that Mr. Madden claimed to have suffered as a result of muscle injury that occurred during the first ablation.

The Multidisciplinary Tumor Board met on December 10, 2010. The Board decided that Mr. Madden should be set up for transplant evaluation because he had developed a second lesion. The Board noted that they would continue to follow this lesion and might proceed with an unspecified local regional therapy to treat the lesion. Local regional therapy to treat the lesion includes the possibility of a second ablation.

Dr. Luy accepted Dr. Musat's recommendations and submitted a Class III request for Mr. Madden to be referred for liver transplant evaluation. Because the Board had indicated that it might proceed with a second ablation, Dr. Luy did not refer Mr. Madden to the UW Pain Clinic. Madden had an existing prescription of Methodone, 5 milligrams, 3 times a day to manage his complaints of pain. At this time, Dr. Luy maintained his Methadone prescription for continuing pain management.

In collaboration with Dr. Musat and the UW Liver Transplant Team, Dr. Luy continued to assess and provide treatment to Mr. Madden's health care needs. Specifically, Mr. Madden was seen by Dr. Musat at the UW on March 16, 2011, where Dr. Musat noted that Mr. Madden had been prescribed methadone for pain management; and on July 11, 2011, when Dr. Musat recommended Mr. Madden have an analgesia as needed for pain at the ablation site. During this time frame, Dr. Musat did not make any further referrals to the UW Pain Clinic.

On November 16, 2011, Mr. Madden was seen by Dr. Musat in the Liver Transplant Clinic. After exam, Dr. Musat noted a 2.3 cm hepatocellular carcinoma in the left lobe of the liver, and concluded that the tumor needed ablation. Dr. Musat further noted that Mr. Madden had experienced significant muscle injury at the time of the first microwave ablation, stating that he expected Mr. Madden to need chronic analgesia and recommended

- 8 -

that methadone be increased to 10 mg twice daily for better pain control. Dr. Luy accepted Dr. Musat's recommendation and increased Mr. Madden's methadone prescription to 10 mg, twice daily.

On January 18, 2012, Mr. Madden underwent a second ablation performed by Dr. Holt with the UW. Dr. Luy, along with Dr. Musat and other UW specialists, continued coordinating to assess and provide treatment to Mr. Madden's health care needs. Specifically, Mr. Madden was seen by Dr. Musat at the UW on: February 29, 2012, Dr. Musat recommended increasing the methadone to 20 mg, 3 times a day, for pain control; November 28, 2012, Dr. Musat noted the continued pain complaints but did not recommended change to the current pain management plan; February 18, 2013, after evaluation Dr. Musat recommended a methadone prescription of 15 mg twice a day; and May 22, 2013, where Dr. Musat again noted Mr. Madden's continued complaints of pain but did not recommend any changes to the pain management plan. During this time frame, Dr. Luy noted Dr. Musat's recommendations and adjusted Mr. Madden's methadone prescription accordingly for pain management.

Of note, on February 18, 2013, on a request for Authorization for Chronic Opioid Use, Dr. Luy noted that Mr. Madden was caught deviating methadone to sell to other inmates twice, but that he could not discontinue methadone liquid because this was recommended by Dr. Musat for pain. Dr.

Luy further noted that "APAP" and "NSAIDS" with Amitriptyline tried in the past offered no benefit. Id. The methadone prescription was approved on February 20, 2013, for 15 mg 2 times a day.

Dr. Luy met with Mr. Madden on August 5, 2013 for his continued complaint of pain with Travis Brady, HSU nurse, present. Throughout the session Mr. Madden alleged that he was damaged by the ablation probe at UW Hepatology and stated that methadone use is "contraindicated in liver disease." Mr. Madden also stated that Dr. Musat told him that methadone liquid does not have the same potency as the tablet form since it is diluted. Id. Mr. Madden definitely wanted to discontinue methadone liquid and agreed with tapering the dose gradually at monthly intervals. At this point in time, Mr. Madden still refused to have any lab workup and follow up appointment with Dr. Musat for determination of current status of the HCC.

Based on his findings, Dr. Luy submitted an urgent Class III request for Mr. Madden to be referred to the UW Pain Clinic. This Class III request was approved. Madden was seen for exam in the UW Pain Clinic on August 8, 2013.

On November 5, 2013, Mr. Madden was transferred to the New Lisbon Correctional Institution. Dr. Luy had no further involvement in Mr. Madden's medical treatment.

**DISCUSSION**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court accepts as true the evidence of the nonmovant and draws all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. *Arnett*, 658 F.3d at 750 (citing *Estelle*, 429 U.S. at 104). To succeed on such a claim, a plaintiff must show (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition." *Berry v. Peterman*, 604 F.3d 435, 439 (7th Cir. 2010).

For the objective element, a medical condition is serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Defendants do not dispute that Madden can satisfy this element.

The subjective component – deliberate indifference – requires a "sufficiently culpable state of mind." *Arnett* at 751. "Deliberate indifference requires a showing of more than mere or gross negligence," – i.e., more than ordinary medical malpractice negligence – "but less than purposeful infliction of harm." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). "The point between these two poles lies where the official knows of and disregards an excessive risk to inmate health or safety or where the official is both aware of facts from which the inference could be drawn and that a substantial risk of serious harm exists, and he ... draws the inference." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). A prisoner who receives some treatment can still establish deliberate indifference so long as the treatment received is "blatantly inappropriate." *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). The Court does not look to incidents in isolation, but considers the totality of medical care provided to the plaintiff. *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000).

Madden has failed to demonstrate that there is a genuine issue of fact

for trial. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). To the contrary, the undisputed evidence demonstrates that neither defendant was deliberately indifferent to Madden's medical needs.

Madden complains that he suffered complications from the May 8, 2008 microwave ablation – a small area of diaphragmatic burn and intercostal musculature burn. However, it is undisputed that Dr. Foley did not perform that procedure. Madden further asserts that Dr. Foley did not tell him about the complications. Dr. Foley disputes this assertion, but even if true, Dr. Foley's alleged nondisclosure does not create an issue of fact on deliberate indifference. Madden alleges that his pain could have been managed better if Dr. Foley had told him about the complications, but Dr. Foley noted the burns in Madden's medical records, making them known to all subsequent treating providers. In any event, Madden does not complain about the treatment he received from Dr. Foley (aside from the ablation, which Madden mistakenly attributed to Dr. Foley). Dr. Foley's course of treatment "was not so far afield as to allow a jury to infer deliberate indifference." *Duckworth*, 532 F.3d at 680. *See* Defendant's Proposed Findings of Fact, ¶ 29 ("Dr. Foley further noted that Madden developed fevers as high as 102. This was followed sequentially and treated with Tylenol and ibuprofen and felt to be related to the necrotic liver portion post the ablation").

Madden alleges that Dr. Loy acted with deliberate indifference by

refusing to comply with Dr. Musat's December 2010 recommendation to send him to a pain clinic. However, Dr. Musat's recommendation was to send Madden to the UW Pain Clinic "[s]hould it be [the Multidisciplinary Tumor Board's] conclusion that an ablation is not performed at this time, …" Exhibit 102, at 117. The Board's recommendation raised the possibility of ablation as an alternative to a liver transplant. Therefore, Dr. Luy did not send Madden to the Pain Clinic. Thereafter, Dr. Luy continued to treat Madden *in collaboration with Dr. Musat*, who did not object to Dr. Luy's failure to refer Madden to the Pain Clinic. This agreed-upon course of treatment cannot be characterized as "blatantly inappropriate." *Roe*, 631 F.3d at 858.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT the defendants' motion for summary judgment [ECF No. 57] is GRANTED. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 19th day of February, 2015.

BY THE COURT:

HON. RUDOLPH T. RANDA
U.S. District Judge

- 14 -